# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

ROYAL PACIFIC LIMITED, *a*
*New Mexico Corporation*,

       Plaintiff/Counter-Defendant,

v.

                                                                     No. 1:17-cv-00357-DHU-JFR

FAITH ELECTRIC MANUFACTURE
COMPANY, LTD., *a Chinese Corporation*,

       Defendant/Counter-Claimant.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Plaintiff/Counter-Defendant Royal Pacific Limited ("Royal")'s Motion for Summary Judgment (Pl.'s Mot., Doc. 80). Defendant/Counter-Claimant Faith Electric Manufacture Company, Ltd., ("Faith") filed a response brief in opposition (Def.'s Resp., Doc. 89), to which Royal replied (Pl.'s Reply, Doc. 98). Having reviewed the parties' submissions, arguments, relevant law, and being fully informed of the premises, the Court concludes that the motion will be **DENIED**.

## FACTUAL BACKGROUND

### A.     The Parties' Operations

Royal is a company that distributes lighting fixtures, ceiling fans and electrical supplies to retail outlets and electrical contractors. Declaration of Jim ("Brewer Decl.") ¶ 3, Pl.'s Ex. A, Doc. 80-2. Faith is a foreign corporation that manufactures electrical equipment. Pl.'s Compl., ¶¶ 3, 7, Doc. 1. Mr. Ziggy Chen formed Faith in 2013. Def.'s Statement of Additional Material Facts ("Def.'s AMF"), ¶ 1, Doc. 89. His father, Chen Gui, owned and operated Fujian Hongan Electric Co., Ltd. ("Hongan"), an electrical component manufacturer. *Id*., at ¶ 2. Around 2008, Hongan began selling ground fault circuit interrupters ("GFCIs") to Menards[1], a home improvement chain store in the United States, and the two businesses maintained a good relationship. *Id*., at ¶ 4, 5.

After Hongan's supplier to Menards began having financial problems, the Chens became concerned about servicing the Menards account, so they began looking for another distributor. *Id*., at ¶¶ 3, 6. The elder Mr. Chen was friends with Royal's owner, Andy King. *Id*., at ¶ 7. Mr. Chen and Mr. King made a "hand-shake agreement" appointing Royal as Hongan's representative to sell Hongan's GFCI products to Menards beginning around 2012. *Id*. Royal had not done

---

[1] The parties refer to this company as "Menard" or "Menards." Because the company is identified in business documents as "Menards" with a registered trademark symbol, *see* Def.'s Ex. A, 113-124, Doc. 89-1, the Court refers to the company as "Menards."

business with Menards at that point. *Id*., at ¶ 8. In addition to engaging Royal as its distributor to Menards, Hongan was also making GFCIs for Royal to sell to electrical trade distributors. *Id*., at ¶ 9.

In 2013, the elder Mr. Chen reduced his work hours and agreed that his son Ziggy could assume Hongan's obligations for the Menards account subject to Menards' approval. *Id*., at ¶ 11. Menards consented, and in December 2013 Faith began manufacturing GFCIs and other electrical equipment for Menards. *Id*., at ¶ 12.

**B.    The Distributorship Agreement**

In the summer of 2015, Faith executives entered into a written contract with Royal governing the Menards account and other home improvement stores that Royal had agreed to approach on Faith's behalf. *Id*., at ¶ 17. In July 2015, the parties signed a written "Distributorship Agreement." *Id*., at ¶ 19; Distributorship Agreement 2, Pl.'s Ex. C, Doc. 80-4. Under the agreement, Faith and Royal agreed as follows:

1.1.    Faith appoints [Royal], an independent contractor, as an   exclusive authorized distributor within North America for products manufactured by Faith … including but not limited to USB Receptacle and Self-testing GFCI … (the "Products") with respect to the companies (Company) listed in Appendix A [*i.e.* Home Depot, Lowes, Menards, etc.] …

1.2    The exclusivity period shall be for a period of 3 years[.] In case [Royal] secures an order from a Company, [Royal]'s exclusivity

period for this Company should be extended to 5 years from the effective date of this agreement.

1.3 [Royal] agrees to diligently market and sell the Products to the retailers listed in Appendix A during the exclusivity period.

*Id.*, at 2.

If a party defaulted, then the non-defaulting party had the option to terminate the agreement by providing a 30-day written notice to the defaulting party. *Id.*, at 4. The defaulting party then "ha[d] the option of preventing the termination of th[e] Agreement by taking corrective action that cure[d] the default, if such corrective action [was] taken with 60 days after receiving the notice …." *Id.* In addition, the agreement constituted the final agreement and "supersede[d] all prior communications, agreements and discussions." *Id.*, at 3.

## C. Promulgation of Underwriters Laboratories Standard 943 and Customer Complaints

A GFCI prevents a person from getting shocked if the GFCI senses a ground fault. Expert Report of Andrew Paris ("Paris Report"), 7, Doc. 80-7. GFCIs traditionally only had a user operated "push-to-test" button. *Id.*, at 9. Underwriters Laboratories ("UL"), a testing laboratory that establishes safety standards, promulgated UL 943, which required GFCI receptacles made after June 28, 2015, to contain self-test functionality without relying on the user to manually test the GFCI. *Id.*; Deposition of Kevin Nett ("Nett Depo."), 34:22-25 – 35:1-2, Pl.'s Ex. D, Doc. 80-5.

To meet the new UL 943 standard, Faith redesigned its GFCIs so that a light indicated the unit's ground fault capability. Nett Depo., at 38:4-12. Pl.'s Statement of Undisputed Material Facts ("Pl.'s UMF") ¶ 1, Doc. 80, at 7. If the unit's light was green, then there was GFCI protection. But if the light was red, then it lacked GFCI protection. Nett Depo., at 38:20-25 – 39:1-6. In October 2015, another laboratory called Intertek Testing Services NA, Inc. ("Intertek") certified Faith's redesigned GFCIs as compliant with UL 943 and authorized Faith to apply the Electrical Testing Laboratory ("ETL") mark on its products. Def.'s Resp. to Pl.'s Fact No. 1, Doc. 89.

Beginning January 2016, Menards began selling the redesigned GFCIs under its private label called "Smart Electrician." Pl.'s UMF, at ¶ 1; Def.'s Resp. to Pl.'s Fact No. 1. In February and March 2016, Royal told Faith that about 20 customers returned the items to Menards because of functionality issues. Def.'s Resp. to Pl.'s Fact No. 2.[2] Customers complained that the units lacked GFCI protection

---

[2] Royal submitted a database of customer complaints from around 65 Menards customers from February 2016 – January 2017. Faith objected that the complaint log is hearsay. Normally a court disregards hearsay on summary judgment when there is a proper objection to its use, *see Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007), because "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Brown v. Perez*, 835 F.3d 1223, 1232–33 (10th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2) adv. comm. cmt.). Royal submitted the complaint log and Mr. Brewer's declaration that Royal "maintained a log of the complaints." Brewer Decl., at ¶ 14. Although Royal did not identify how the complaint log could be admissible at trial, at the summary judgment stage the Court will consider it because

capability but nonetheless "would still have power at the outlet," and that the units essentially "would not function as a GFCI." Nett Depo. 39:21-25 – 40:1-11. Royal refers to this issue as the "no GFCI protection/power still on" defect. Pl.'s Mot. at 2. Menards was concerned that "somebody was going to get seriously injured or killed." Nett Depo., at 41:3-7.  However, Menards never actually verified whether customers' complaints were accurate because Menards' policy was to accept returns to maintain consumer good will. *Id*., at 134:19-25 – 135:1-7.

According to Faith, though, the redesigned GFCIs in fact "performed consistent with the new UL 943 [s]tandard." Def.'s Resp. at 6. Under that standard, a GFCI had to indicate its "end of life" status *either* by making a visual and/or audible signal *or* by cutting off its own power. Expert Report of Joe Nowikowski ("Nowikowski Report"), 13, Doc. 89-5 (emphases added). Faith's GFCIs flashed red, meaning the units were not required to cut off power so long as a visual signal indicated that the unit needed replacing. *See* Def.'s Resp. to Pl.'s Fact No. 3

Nonetheless, meeting the UL standard did not necessarily make the units acceptable to Menards. Charles Ochs, a Menards buyer, testified that Faith's GFCIs "met UL specification," but nevertheless Menards "was not satisfied with how they performed." Deposition of Charles Ochs ("Ochs Depo."), 20:20-22, Pl.'s Ex. V, Doc. 98-5. Ochs testified that Menards "could not buy from somebody that

Mr. Brewer's declaration tends to indicate that it would qualify under Fed. R. Evid. 803(6) as a business record.

continued to ship us GFCIs like that," and stated that Menards "would not have continued to purchase a GFCI that had a red failure light and power at the receptacle." *Id.*, at 85:14-15, 95:7-9.

**D.    April 2016 Meeting Between Royal, Faith and Menards**

On April 21, 2016 officials from Royal, Faith and Menards met. Pl.'s UMF, at ¶ 18. The purpose of the meeting was for Faith to "present Menard[s] with concrete information on the functions permitted by the new UL 943 [s]tandard." Def.'s Resp. to Pl.'s Fact No. 11. Eric Chan, Faith's then-executive director, attended the meeting. Faith officials explained that the GFCI problems could be among customers in areas where the input voltage was low. Declaration of Eric Chan ("Chan Decl."), ¶¶ 2, 42, Def.'s Ex. B, Doc. 89-2. Mr. Chan told Menards officials that Faith was going to consult with Intertek to address the situation. *Id.*, at ¶ 42. Menards representatives never threatened to stop using Faith as its supplier nor demanded that the Faith GFCIs function like those of a competitor brand. *Id.* Menards in fact believed that its relationship with Royal "was good" and Menards anticipated "get[ting] a product that functioned the way [Menards] thought it should." Nett Depo., at 48:18:25 – 49:1. Moreover, Menards never asked Royal to provide GFCIs from vendor other than Faith. Pl.'s Answer to Def.'s Request for Admis. No. 6, Def.'s Ex. G, Doc. 89-7, 4.

Another attendee, Menards employee Kevin Nett, testified that the meeting was in fact convened "[t]o discuss [Menards'] concerns with" the GFCIs. Nett Depo., at 46:17-24. According to Nett, Menards officials expressed dissatisfaction with the Faith-made GFCIs and indicated that Menards was contemplating terminating the purchase of GFCIs from Royal and Faith because of product defects. *Id.*, at 46:25 – 47:1-13. Menards was scared that its private label and image would suffer and Menards officials "discussed whether [Menards] should find a new source." *Id.*, at 47:21-22, 48:7-9. According to Mr. Nett, Menards officials "provide[d] specific guidance" during the meeting that they wanted the units to shut off power and for the lights to function like a competitor brand's GFCIs. *Id.*, at 49:8-19, 51:6-15. Chris Berglund of Royal also attended the meeting. Pl.'s UMF, at ¶ 18. Mr. Berglund's post-meeting notes also state that throughout the meeting, Royal officials asked for the GFCIs to shut off all power. Ex. 8 to Deposition of Chris Berglund ("Berglund Depo."), Pl.'s Ex. E, Doc. 80-6.

## E.   Faith Redesigns the GFCIs

Immediately after the April 2016 meeting, Faith consulted with Intertek. Chan Decl., at ¶ 43. Faith received Intertek's approval and adjusted the units to include an audio signal and adjusted voltage range capabilities. *Id.*, at ¶¶ 48-49; Declaration of Gary Frush ("Frush Decl."), ¶¶ 24, 25, Def.'s Ex. H, Doc. 89-8. Faith began production in May 2016, shipped the adjusted units to Menards in June

8

2016, and by July the adjusted units were on Menards' shelves. Def.'s Resp. to Pl.'s Fact No. 11.

Royal claims that the alleged problems with the GFCIs persisted. Complaints in August 2016 were "particularly heavy" and "memorably bad," according to Mr. Brewer. Brewer Depo., at 63:8-9, 63:19-21. In August 2016, Menards also received an email from Jon Mattson, a Wisconsin residential building inspector. Deposition of Jon Mattson ("Mattson Depo."), 10:15-16, Pl.'s Ex. G, Doc. 80-8. In the email, which was also sent to a public safety department, Mattson wrote about "serious issues" with the GFCIs and stated that consumers "are not going to know that there [sic] GFCI receptable will NOT be protecting them if the green light is not illuminated." Ex. 1 to Mattson Depo. Doc. 80-8, at 21.

However, Faith "never claimed that it had created a Smart Electrician that" cut off power. Def.'s Resp. to Pl.'s Fact No. 24. Moreover, Royal's own board meeting notes from August 2016 reflect that "[t]he GFCI business ha[d] stabilized with Menard[s]," Def.'s Ex. K, Doc. 89-11, 24-25, even though Mr. Brewer claimed that complaints from the same period were memorably bad. As for Mr. Mattson's statements, Mattson was unfamiliar with the pertinent UL standard testified that he "had a problem with the UL standards" even though Faith's GFCIs complied with those standards. Mattson Depo. at 203:5-8, Def.'s Ex. L, Doc. 89-12.

**F.    At Menards' Request, Third-Party Testing Was Performed on the GFCIs**

Menards wanted third-party testing to verify that the modified GFCIs complied with Menards' request and Menards asked Royal to obtain a tester. Pl.'s UMF ¶ 37; Nett Depo., at 56:1-4. Royal hired Intertek, and Mr. Brewer emailed Mr. Chan that Royal wanted to be "as prepared as possible should Menards request another quality review meeting" and that "having a third party endorsement of our product will certainly help our cause." Pl.'s UMF, at ¶ 40. Mr. Chan responded that testing was a good initiative and asked how many units Royal needed for testing. *Id.*, at ¶ 41. Royal sent Intertek the original and redesigned Faith-made GFCIs and sent 10 units of made by General Protecht ("GP"), a competitor brand. Intertek's testing engineer, Matthew Grunst, testified that his examination showed that Faith's redesigned GFCIs alleged still had the "no GFCI protection/power still on" defect. Depo. of Matthew Grunst, 58:16 – 64:24, Pl.'s Ex. K, Doc. 80-11; Intertek Test Report, Pl.'s Ex. L, Doc. 80-12.

However, Faith's expert, Joseph Nowikowski, opined that the Electro-Magnetic Compatibility Test ("EMC Test") and Highly Accelerated Life Test ("HALT") that Intertek performed were not required by UL 943. Declaration of Joseph Nowikowski ("Nowikowski Decl.") ¶¶ 6-7, Def.'s Ex. E, Doc. 89-5. Moreover, although the HALT and EMC tests were not required under UL 943,

Mr. Nowikowski opined that Faith's units in fact passed those tests "and performed substantially equal to both the control competitive samples tested." *Id.*, at 20.

In addition, Royal's real purpose behind the Intertek testing was to make Faith look bad and convince Menards to "drop Faith and switch to GP." Def.'s Resp. to Pl.'s Fact No. 37. GP had already been supplying Menards with Smart Electricians and supplying Royal with GFCIs for Royal's electrical trade distributors and Royal made more money on those accounts than it did on the Menards account. Pl.'s Resp. to Def.'s Interrog. No. 24, Def.'s Ex. N, Doc. 89-13; Def.'s Statement of Additional Material Facts ("Def.'s AMF") ¶ 34. Mr. Brewer engaged Intertek after conversations with GP about GP supplying Menards. *Id*; Def.'s Ex. N, Doc. 89-14.

## G.     October and November 2016 Email Communications

In October 2016, a Royal official wrote Messrs. Chen and Chan that the complaint of Mr. Mattson caused "great concern at Menards." Pl.'s Ex. M. Mr. Chan responded, "I can see [Mr. Mattson's] view: if there is ground faults, the GFCI should detect and cut off the power"; however, the context of Mr. Chan's statement was to "determine[e] whether Mr. Mattson had any bona fide observations." Pl.'s Ex. N, Doc. 80-14; Def.'s Resp. to Pl.'s Fact No. 47.

In November 2016, Charles Ochs of Menards asked Royal if the Faith-made GFCIs would cut off power if the unit lost the ability to protect against a ground

fault. Pl.'s Ex. O, 4, Doc. 80-15. Royal forwarded the email Mr. Chan, who responded that if there is an "out-of-range low voltage where the tripping mechanism itself is not working property, in that case, the device may not 'trip', but cannot 'kill' the power." *Id.*, at 2.

## H.   December 2016 Meeting Between Royal and Menards

In December 2016, Mr. Brewer, without tell Messrs. Chen or Chan, met representatives from Menards and told them about the HALT and EMC tests comparing Faith's GFCIs to GP's. Def.'s AUMF, at ¶ 44. His PowerPoint presentation stated that Royal, "[r]esolved [its] GFCI supply liability by changing to a new supplier," and that it had been working "with an attorney to develop a strategy for termination of our Exclusivity and Indemnification Agreement with Faith. Our top priority is to protect Menards [sic] supply." Def.'s Ex. K, 18, Doc. 29-11. During this same period, Menards nevertheless issued purchase orders for 38,652 Faith-made Smart Electricians, and between January 19 – March 7, 2017, Menards made another 89,132 purchases of the units. Def.'s AUMF, at ¶¶ 56-57.

## I.   Faith Asks Menards to Remove and Replace Faith-Made USB Wall Outlets

In this same period, Faith asked Menards to remove and replace Faith-made USB wall outlets, which were also governed by the distributorship agreement. The USB wall outlets were new products. Chan Decl., at ¶ 51. Kevin Nett of Menards testified that the USB wall outlets were ungrounded and could potentially shock a

person. Nett Depo., at 21:6-13, Doc. 80-5. However, this is because purchasers were unexpectedly installing the units in plastic rather than metal boxes, rendering them ungrounded. Chan Decl., at ¶ 54. Faith received Intertek's permission to include a grounding wire with the unit to account for those purchasers who installed the units in plastic boxes. *Id*., at ¶ 55. Faith then requested that Menards remove and replace the existing units, which Menards did. *Id*., at ¶ 56.  Mr. Nett testified that this event hurt the Royal/Menards relationship. Nett Depo., at 33:8-13.

**J.     Royal's March 20, 2017 Letter**

On March 20, 2017, Mr. Brewer sent Mr. Chen a letter telling him that Royal was terminating its contract with Faith because Faith put Royal's relationship with Menards at risk. Chan Decl., at ¶ 58. Mr. Brewer stated that over 13 months, every Faith-made product had been the subject of quality complaints. Letter of Jim Brewer to Ze Chen ("Brewer Letter"), Pl.'s Ex. C, 2, Doc. 80-16. Mr. Brewer's letter cited various alleged problems with the GFCIs, including 64 customer complaints, and alleged problems with USB power outlets and cover plates. *Id*., at 2-3.

Faith tendered the expert report of Dr. Allen Parkman, a professor emeritus of management at the University of New Mexico, to opine about the rate of complaints compared to the number of sales. Expert Report of Allen Parkman

("Parkman Report"), 4, 6, Def.'s Doc. 89-6. According to Dr. Parkman, in 2016 Menards sold 543,891 Faith-made units. *Id.*, at 4. Of those sales, 490 were complained about as noted in Mr. Brewer's letter – a complaint rate of 0.090%. *Id.* The period between January to March 2017 (the month Mr. Brewer sent the letter) shows a complaint rate of 0.026%. *Id.* Mr. Parkman opined that the complaint rate was "miniscule." *Id.* at 16. Mr. Parker also opined that complaints dropped further after Faith redesigned its units following the April 2016 meeting. *Id.* There were 428 complaints from February to August 2016. *Id.* From September 2016 to March 2017, that number dropped to 92. *Id.*

## PROCEDURAL BACKGROUND

On March 21, 2017, Royal brought a complaint in this Court based on the parties' diverse citizenship under 28 U.S.C. § 1332(a) and the distributorship agreement's stipulation that the "parties submitted … to the non-exclusive jurisdiction of the courts of the State of New Mexia [sic] and, if applicable, the United States District Court for the District of New Mexico." Pl.'s Compl. ¶¶ 4-5, Doc. 1. Royal alleged in its complaint that, in 2016, quality problems arose several of Faith's products, including the GFCIs. *Id.*, at ¶¶ 13-14. Royal further alleged that it notified Faith but that Faith failed to remedy the problems and that, because the quality problems "damaged Royal Pacific's reputation and harmed Royal Pacific's business relationship with Menards," Royal terminated the

Distributorship Agreement in March 2017. *Id*., at ¶¶ 29, 26. Royal sought a declaratory judgment that Faith breached the contract between them and breached the implied warranty of merchantability.

Faith denied that any of its products were defective and alleged in counterclaims that Royal breached the distributorship agreement, defamed Faith, violated the New Mexico Unfair Practices Act, interfered with Faith's prospective business advantage, and committed prima facie tort. Def.'s Answer, Affirmative Defenses and Counterclaim, 12-16, Doc. 10. The Court previously dismissed certain of Faith's counterclaims and permitted Faith leave to amend its counterclaims, which Faith declined to do. As a result, Faith presently only maintains a counterclaim for breach of contract of the distributorship agreement.

On September 30, 2020, Royal moved for summary judgment in its favor, which the Court proceeds to analyze below.

## STANDARD OF REVIEW

A party is entitled to a summary judgment "if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108 (10th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it can have an impact on the outcome of the lawsuit and genuine if a rational jury could find in favor of the non-moving party based on the evidence presented." *New Mexico Oncology & Hematology*

*Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171 (10th Cir. 2021). The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact. *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "If the moving party does not bear the burden of proof at trial on a dispositive issue, that party may make such a showing simply by indicating to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id*. "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial." *Id*.

"Summary judgment in favor of the party with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Thus, if the moving party has the burden of proof, its showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (citation omitted, alteration in original). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id.*

16

(citation omitted). The district court's role in analyzing a motion for summary judgment is to simply "assess whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1150 (10th Cir. 2005).

## DISCUSSION

### 1.    Breach of Contract (Count I)

Royal moves for summary judgment on its breach of contract claim, arguing that Faith materially breached an essential purpose of the distributorship agreement – namely, to make a functional GFCI. Faith contends that there are triable issues whether the GFCIs were in fact defective. The Court concludes that the differing accounts present a genuine question of fact and that, at this stage, Royal has failed to carry its summary judgment burden to show that its evidence is "so powerful" that a jury would be compelled to find in its favor. *Leone*, 810 F.3d at 1153.

Neither party disputes that New Mexico law governs Royal's breach of contract claim. In New Mexico, a plaintiff is required to prove a valid contract, breach of the contract, and damages to prevail on a breach of contract claim. *Alderete v. City of Albuquerque*, No. 33,151, 2015 WL 1143085, at *1 (N.M. Ct.

App. Feb. 23, 2015) (citing *Constr. Contracting & Mgmt., Inc. v. McConnell,* 112 N.M. 371, 815 P.2d 1161 (N.M. 1991) (unpublished)).[3]

The parties' dispute centers on the second element – breach of a contract. Under New Mexico law, "[a] person may breach a contract by failing to perform a contractual obligation when that performance is called for (unless that performance is otherwise excused)." NMRA CIV UJI Rule 13-822 (brackets omitted). The non-breaching party may be excused from further performance under the contract if the breach is material. *KidsKare, P.C. v. Mann*, 350 P.3d 1228, 1234 (N.M. Ct. App. 2015) (citing *Famiglietta v. Ivie–Miller Enters., Inc.,* 126 N.M. 69, 966 P.2d 777) (N.M. Ct. App. 1998)). A breach is material if it results in the "failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Id*.

To determine whether a breach of contract is material, New Mexico courts consider five factors: (1) the extent to which the injured party will be deprived of the benefit it reasonably expected to receive from the contract, (2) the extent to which the breaching party will suffer forfeiture if the breach is deemed material, (3) whether the injured party can be adequately compensated in damages for the

---

[3] Faith contends that factual questions exist about Royal's alleged fiduciary duties as Faith's agent and whether Royal actually incurred damages. However, neither party requested summary judgment on either of these theories. The Court therefore does not address or decide Faith's contentions given that neither party requested judgment on those theories.

breach (4) the likelihood that the breaching party will cure his or her failure to perform under the contract (5) whether the breaching party's conduct comported with the standards of good faith and fair dealing. *Famiglietta*, 126 N.M. at 74, 966 P.2d at 782.[4] The materiality of a breach is a specific question of fact. *KidsKare*, 350 P.3d at 1234.

Royal first contends that summary judgment in its favor is appropriate because the Faith-made GFCIs were defective. Pl.'s Mot. at 16. Despite Royal's argument that the GFCIs were defective, the Court finds that Faith has provided evidence to raise a triable issue of fact on defectiveness. Faith submitted evidence that after the UL change Intertek certified Faith's redesigned GFCIs as compliant in January 2016 and again in May 2016 after Faith adjusted the units following the April 2016 meeting. In each instance, Faith received Intertek's authorization to mark, which "signifies compliance with the UL 943 requirements." Nowikowski Report, at 16. Royal claims that "UL compliance is … a red herring" because Menards was aware that the GFCIs complied with the UL standard, but Menards was nonetheless unsatisfied with their performance. Pl.'s Reply, 19-20, Doc. 98. The Court concludes that evidence of compliance with industry standards may not be sufficient to obtain or defeat summary judgment, but such evidence is for the

---

[4] Royal's motion did not explicitly cite the *Famiglietta* factors, which only reinforces the Court's conclusion that summary judgment in Royal's favor is inappropriate.

jury to consider when determining the merits of Royal's claim that Faith materially breached the contract.

Royal next contends that the facts show that Menards refused to continue purchasing the units unless the defect was remedied, and that Menards wanted the GFCIs to work like GFCIs made by other brands. Pl.'s Mot. at 16. However, the evidence supporting Royal's arguments are genuinely disputed. Royal submitted statements from Messrs. Nett and Berglund that during the April 2016 meeting, Menards officials stated they wanted the GFCIs to shut off power, to replicate the GFCIs of another brand, and that Menards was contemplating terminating the purchase of GFCIs. Faith, meanwhile, submitted the declaration of Mr. Chan, an attendee at the meeting, who stated that Menards never threatened to stop using Faith as its supplier nor demanded that the Faith GFCIs function like the those of another brand. The Court cannot enter summary judgment in favor of Royal based on its evidence. To do so would be improperly deciding motion based on a weighing of the witnesses' statements that is reserved for the trier of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.")

Finally, Royal contends that Faith's attempted redesign of the GFCIs "failed to cure the defect" as confirmed by third-party testing, and that Faith eventually

admitted that it was unable to cure the defect. Pl.'s Mot. at 16-17. There is a genuine dispute about whether Faith's redesign of the units failed to cure an alleged defect given that the parties dispute what the "defect" in question was. The trier of fact will have to evaluate the parties' competing evidence about whether the Faith-made GFCIs passed the HALT testing and whether Intertek's testing implicated the UL standard. As to Royal's assertion that Faith admitted that it was unable to cure the alleged defect, Royal points to Mr. Chan's email after learning about Mr. Mattson's complaint. Mr. Chan stated, "I can see his view: if there is ground faults, the GFCI should detect and cut off the power," which Royal interprets as an "admission." Pl.'s Ex. N, Doc. 80-14. Royal also believes Mr. Chan admitted fault when he said in email correspondence that if there is an out-of-range low voltage scenario, "the device may 'trip', but can not 'kill' the power." Pl.'s Ex. O, Doc. 80-15. However, the Court must draw inferences in Faith's favor. Accordingly, the Court assumes that the context of Mr. Chan's statement concerning Mr. Mattson's complaint was to "determin[e] whether Mr. Mattson had any bona fide observations." Def.'s Resp. to Pl.'s Fact No. 47. Also drawing inferences in Faith's favor, as the Court must, Mr. Chan second statement demonstrates compliance with the UL standard, which did not require a power shut-off if the unit reached end-of-life status as long as the unit signaled.

In summary, Royal's motion for summary judgment on its breach of contract claim is denied because genuine factual controversies exist.

**2.      Breach of Implied Warrant of Merchantability (Count II)**

Royal seeks summary judgment that Faith breached the implied warranty for merchantability under the New Mexico Uniform Commercial Code, N.M.S.A. 1978, § 55-2-314. "To establish a claim for breach of the implied warranty of merchantability, a plaintiff must prove that the seller sold goods or products that failed to meet the statutory definition of 'merchantable.'" *Suttman-Villars v. Argon Med. Devices, Inc.*, 553 F. Supp. 3d 946, 959 (D.N.M. 2021) (quoting *Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc.*, 184 F. Supp. 3d 1030, 1059 (D.N.M. 2016)). Section 55-2-314 states that, *inter alia*, goods are merchantable if they "pass without objection in the trade under the contract description," "are fit for the ordinary purposes for which such goods are used," and "run … of even kind, quality and quantity within each unit and among all units involved." N.M. Stat. Ann. § 55-2-314. "A breach of the implied warranty of merchantability claim 'thus requires proof of a defect.'" *Am. Mech. Sols., L.L.C.*, 184 F. Supp. 3d at 1060 (citations omitted). "However, to establish a breach of the implied warranty, a buyer is not required to prove a *specific* defect in the goods." *Salazar v. D.W.B.H., Inc.*, 144 N.M. 828, 834, 192 P.3d 1205, 1211 (N.M. 2008) (citation omitted, emphasis in original). "Rather, a buyer can use circumstantial evidence to show

that the goods were not fit for the ordinary purpose for which they were intended." *Id.*

The parties dispute whether Faith was a "merchant" under the UCC. Royal claims that Faith was a merchant; Faith claims that Royal was its agent. A "'merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction …." N.M. Stat. Ann. § 55-2-104(1). Merchant status under the UCC appears to be a question of fact. *See Citizens Bank of Clovis v. Runyan*, 109 N.M. 672, 676, 789 P.2d 620, 624 (N.M. 1990) ("a material issue of fact remains concerning whether Clower's status was that of a cattle merchant or an ordinary buyer" under the UCC.) However, even if the jury were to find that Faith is a merchant, there are further questions of fact as to whether the goods were merchantable because of any alleged defect and whether any breach proximately caused Royal's economic injury, the latter of which Royal did not address in its motion. *See Am. Mech. Sols.,* 184 F. Supp. 3d at 1060 ("a breach of the implied warrant of merchantability claim also requires proof of proximate cause.") Because Royal cannot show the absence of a dispute of fact and has not demonstrated that it is entitled to judgment as a matter of law, the Court denies its motion for summary judgment on its implied warranty claim.

**3.      Faith's Affirmative Defense of "Lack of Proper Notice"**

Royal moves for summary judgment on Faith's affirmative defense that Royal did not comply with the distributorship agreement's notice provision when terminating that agreement. *See* Pl.'s Mot. at 24-25. Royal argues that the affirmative defense fails because the notice provision is non-sensical, Faith had actual notice of a pending termination given that it did not cure a defect, and that Faith's breach excused Royal's further performance under the notice provision. However, each of Royal's arguments necessarily assumes that Faith did, in fact, breach the agreement or default under the terms of the agreement. Because Faith has provided sufficient evidence to survive summary judgment on Royal's breach of contract and implied warranty claims, the Court denies Royal's request for summary judgment on Faith's affirmative defense of lack of proper notice.

## 4.    Declaratory Judgment (Count III)

The Declaratory Judgment Act provides that a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Royal seeks a declaratory judgment that Faith breached the distributorship agreement, that the agreement's notice provision is non-sensical, and that Faith had the right to terminate the agreement and right to reject Faith's products and "cover" by obtaining substitution goods. Pl.'s Compl., ¶ 56 (A)-(D). Once again, because each of these requests necessarily depend on a resolution of

fact issues for the jury, the Court denies Royal's motion for summary judgment on its declaratory judgment claim.

## 5.    Request to Limit Faith's Damages

On the final page of its motion, Royal states that, in the alternative, if it does not obtain summary judgment, then Faith "should be limited in the period it can claim damages to the thirty (30) day termination period," Pl.'s Mot. at 28, because "the only legally protectible expectation interest in the party to a contract terminable by either party upon notice is the prospect of profit over the length of the notice period." *Osborn v. Commanche Cattle Indus., Inc.*, (Okla. Civ. App. 1975), 545 P.2d 827, 831. However, the Court does not read Faith's breach of contract counterclaim as being predicated solely on Royal's alleged violation of the notice provision. Faith contended, instead, that Menards was a "significant long-term purchaser" and that Royal's allegedly "false assertion that Faith's products were defect and/or posed a safety hazard – was a breach of contract," and it sought it compensatory, consequential and incidental damages, "including damages for lost good will and harm to Faith's reputation." Def.'s Counterclaim, at ¶¶ 4, 19, 21. Because Royal has not pointed to any New Mexico law establishing that damages are not recoverable in the scenario at hand, the Court denies its request to limit damages to the period of the notice provision. Royal may, of course, renew this argument in an appropriate motion *in limine* before trial.

## CONCLUSION

Plaintiff/Counter-Defendant Royal Pacific Limited's Motion for Summary Judgment **(Doc. 80)** is **DENIED**. The Court will set trial by separate notice.

**IT IS SO ORDERED**.

_____
HON. DAVID H. URIAS
 UNITED STATES DISTRICT JUDGE